# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

**3M COMPANY, and 3M INNOVATIVE
PROPERTIES COMPANY,**

                   **Plaintiffs,**

v.                                   **MEMORANDUM OPINION
AND ORDER
Civil File No. 03-5292 (MJD/AJB)**

**MOLDEX-METRIC, INC.,**

                   **Defendant.**

_____

J. Derek Vandenburgh, Carlson Caspers Vandenburgh & Lindquist, Counsel for Plaintiffs.

Victor deGyarfas and William J. Robinson, Foley & Lardner, LLP, Counsel for Defendant.

_____

This matter is before the Court on Plaintiffs', 3M Company and 3M Innovative Properties Company (collectively "3M"), motion for summary judgment of no inequitable conduct.

## I.  **Background**

3M contends that Defendant Moldex- Metric, Inc. ("Moldex") is infringing four 3M patents directed to valved respirator masks: U.S. Patent Nos. 6,854,463

("the '463 patent") and 6,843,248 ("the '248 patent"), U.S. Reissue Patent No. RE 37,974 ("the '974 patent") and U.S. Patent No. 7,117,868 ("the '868 patent").

The patents in suit all relate to respirator masks having exhalation valves, which are used to prevent inhalation of particulates suspended in the air and typically employ some sort of filter that the air must pass through during inhalation.

The '463, '248 and '868 patents, also referred to as the Japuntich patents, are related to one another through common ancestor applications, and as a result include the same patent disclosure.  In the '248 and '463 patents, the valves include a cantilevered flexible flap with a spring-like curvature which causes the flap to press against the valve in the absence of exhalation.  The '868 patent uses an exhalation valve that has some means for preventing the flap from sticking to the inside surface of the valve cover (e.g. a ribbed or course ceiling).

The '974 patent, also referred to as the Bowers patent, is unrelated to the Japuntich patents.  John Bowers obtained this patent while working for Racal Health & Safety Ltd. ("Racal").  While the Japuntich patents disclose a valve with a cantilevered flap that is curved in the longitudinal direction, the Bowers '974 patent discloses a valve whose flap biases toward the sealing surface by bending

the stationary end of the cantilevered flap in the transverse direction.

The '974 patent is a reissue of Patent No. 5,687,767.  The '767 patent issued on November 18, 1997.  No one at 3M was involved in the prosecution of the Bowers '767 patent.  3M patent attorney Karl Hanson was involved in the reissue application through his management of outside counsel.  The reissue application sought to broaden the '767 patent.  Those efforts were successful and the '974 issued on February 4, 2003.

## II.  <u>Alleged Inequitable Conduct</u>

On December 4, 2006, Moldex filed its Second Amended Answer to the Third Amended Complaint. [Doc. No. 362].[1]  In this pleading, Moldex asserted that the patents in suit are unenforceable because each patent was obtained through inequitable conduct practiced by 3M through its attorney Karl Hanson. The alleged inequitable conduct referenced in this pleading was placed into nine categories: misrepresentations about the Cover prior art; misrepresentations about the Braun prior art; misrepresentations about the general state of the prior art; suppression of the Horda publication; affidavit/declaration misconduct;

---

[1]The same allegations are included in the February 1, 2007 Answers and Counterclaims in Civil No. 06-4044 [Doc. 370], which action was consolidated with this action.

misleading characterization of the invention; false statements about allegedly

nonanalogous art; misrepresentations about the Moldex Ventex valve; and

general violations of the duty of disclosure.  At this time, 3M moves for summary

judgment as to the allegations of inequitable conduct.

### III. <u>Standard</u>

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine issue as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(c); <u>Celotex Corp. v. Catrett,</u> 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact.  <u>Celotex</u>, 477 U.S. at 323.  This burden can be met "by 'showing' -

that is, pointing out to the district court - that there is an absence of evidence to

support the nonmoving party's case."  <u>Id.</u> at 325.  The party opposing summary

judgment may not rest upon mere allegations or denials, but must set forth

specific facts showing that there is a genuine issue for trial.  <u>Krenik v. County of

Le Sueur</u>, 47 F.3d 953, 957 (8th Cir.1995).

3M argues that it is entitled to summary judgment as Moldex cannot

demonstrate, by clear and convincing evidence, each element of its inequitable

conduct claims.  Moldex responds that as the movant, 3M bears the burden of

demonstrating that no reasonable fact finder could find that 3M committed

inequitable conduct, and that summary judgment is not appropriate if there is a

genuine issue of material fact as to any aspect of its inequitable conduct claim.

While true, Moldex nonetheless has the burden to demonstrate, that is put forth

evidence, the existence of genuine issues of material fact as to each element of its

claims in order to survive summary judgment.

## A.  Inequitable Conduct - Elements

Patent applicants and their legal representatives have a duty to prosecute

patent applications with candor, good faith and honestly.  Life Techs., Inc. v.

Clontech Labs., Inc., 224 F.3d 1320, 1324 (Fed. Cir. 2000).  If that duty is breached,

the party breaching that duty has committed inequitable conduct and the patent

subsequently issued is unenforceable.  Id.

There are two elements to an inequitable conduct claim that may render a

patent invalid or unenforceable - materiality and intent to deceive.  "A patent

applicant commits inequitable conduct when, during prosecution of the

application, he makes an affirmative representation of a material fact, fails to

disclose material information, or submits false material information, and does so

5

with the intent to deceive." <u>Amgen Inc. v. Hoechst Marion Roussel, Inc.</u>, 314 F.3d

1313, 1358 (Fed. Cir. 2003) (citing <u>Refac Int'l, Ltd. v. Lotus Dev. Corp.</u>, 81 F.3d

1576, 1581 (Fed. Cir.1996)).

> [A] lesser quantum of evidence of intent is necessary when the omission or
> misrepresentation is highly material, and vice versa.  At the same time,
> however, there must be some threshold showing of intent to be balanced;
> we will not find inequitable conduct on an evidentiary record that is
> completely devoid of evidence of the patentee's intent to deceive the PTO.

<u>Id.</u> (citations omitted).

Information is material if "a reasonable examiner would have considered

such [information] important in deciding whether to allow the parent

application." <u>Digital Control Inc. v. Charles Mach. Works</u>, 437 F.3d 1309, 1314

(Fed. Cir. 2006) (quoting <u>Dayco Prods., Inc. v. Total Containment, Inc.</u>, 329 F.3d

1358, 1363 (Fed. Cir. 2003)).  Information is also considered material if it is not

cumulative, and "establishes, by itself or in combination with other information,

a prima facie case of unpatentability of a claim; or [] refutes, or is inconsistent

with, a position the applicant takes in: (i) opposing an argument of

unpatentability relied on by the Office, or (ii) asserting an argument of

patentability." <u>Monsanto Co. v. Bayer Bioscience N.V.</u>, 514 F.3d 1229, 1237 (Fed.

Cir. 2008) (citing 37 C.F.R. § 1.56).

6

Claims of inequitable conduct have rarely been established.

Even after complete testimony the court should find inequitable conduct only if shown by clear and convincing evidence. A summary judgment that a reputable attorney has been guilty of inequitable conduct, over his denials, ought to be, and can properly be, rare indeed.

Burlington Indus., Inc. v. Dayco Corp., 849 F.2d 1418, 1422 (Fed. Cir. 1988).  See also, KangaROOS U.S.A., Inc. v. Caldor, Inc., 778 F.2d 1571, 1573 (Fed. Cir. 1985); Multiform Desicants, Inc. v. Medzam Ltd., 133 F.3d 1473, 1482 ( Fed. Cir. 1998) (noting that charges of inequitable conduct before the patent office have come to be attached to every patent prosecution, diverting the court from genuine issues and simply spawning satellite litigation).

Moldex argues that based on the Burlington decision, this Court should take heed before granting 3M's motion for summary judgment.  However, the court in Burlington was concerned about finding inequitable conduct where the issue of intent was reasonably disputed.  In this case, the movant is the party against whom the claim of inequitable conduct has been lodged.  Rather than standing for the general proposition that summary judgments on inequitable conduct claims should be rare, the cases stand for the proposition that judgments finding, rather than dismissing, inequitable conduct should be rare when the

evidence supports a reasonable dispute.

### IV. <u>Analysis</u>

### A. Allegations Concerning the Horda Prior Art

### 1. Materiality - the '974 Patent.

With respect to the '974 patent, Moldex has alleged that Hanson intentionally concealed European Patent Publication No. 0 251 890 ("Horda")[2] during prosecution. Vandenburgh Decl., Ex. 13. 3M asserts that Horda is not material to the claims of the '974 patent. 3M further asserts that even if the Court were to find Horda material, there is no evidence that Hanson intentionally withheld this reference with the intent to deceive the patent office.

The '974 patent discloses a cantilevered flap that biases toward the sealing surface by bending the stationary end of the cantilevered flap in the transverse direction. The Horda reference was included in two European Search Reports that were issued during the prosecution of two foreign applications related to the '974 patent. Horda describes a valve device for protective masks, the valve consisting of a valve seat, with a valve membrane of compression-moulded rubber cooperating with the valve seat, the membrane being secured to the valve

_____

[2]Also referenced as Soderberg, who is the inventor, in the prosecution history.

seat close to its edge and opens initially at the edge portion of the member

located opposite the attachment, resulting in low opening resistance, directional

influence on the air flowing through and reduced suppression and distortion of

speech.  Vandenburgh Decl., Ex. 13, p. 1.

European Search Reports classify references using the letter designations

"X", "Y" or "A".  Vandenburgh Decl., Exs. 14-15.  An "X" designation refers to a

reference that is particularly relevant if taken alone, "Y" refers to a reference that

is particularly relevant if combined with another document of the same category

and "A" refers to a reference that provides technological background.  Id.  Horda

was designated as an "A" reference.  Id.  Given it's "A" designation, 3M argues

that Horda should not be considered material.  See Young v. Lumenis, Inc., 341 F.

Supp. 2d 925, 938-39 (S.D. Ohio 2004) rev on other grounds 492 F.3d 1336 (Fed.

Cir. 2007) (finding that a reference defined as providing only technical

background in an international search report not material).

Moldex responds that Horda is material, and that Hanson admitted as

much in his deposition.  Prange Decl., Ex. 7 (Hanson Dep. p. 260).  The deposition

testimony cited, however, does not support Moldex's contention.  Rather,

Hanson stated that with respect to the **Japuntich** patents, not the '974 patent,

Horda was material "albeit cumulative." Id. p. 260-61.[3]  When asked if Horda

was material to the '974 patent, Hanson said that based on his quick reading,

Horda contained all the elements of claim 12 of the '974 patent, except those in

the last clause.[4]  Prange Decl., Ex. 5, (Hanson Dep. p. 23-34).

Moldex asserts that Horda does, in fact, disclose the last clause of claim 12,

which requires that the transverse configuration at the root end of the flap and

sealing surface cause the flap to press against the seal surface.  In support,

--------

[3]Hanson clarified this statement, testifying that a reference cannot be material if it is cumulative, and if he testified that Horda was "material albeit cumulative" he did not intend to say that.  Id. 261-262; 265.

[4]Claim 12 reads:
A uni-directional fluid valve comprising:
    a cantilevered flexible flap and a cooperating valve seat surrounding a valve orifice;
    the cantilevered flexible flap having a planform defining a root end and a free end at opposite ends of a longitudinal axis of the flap;
    the valve seat having sealing surfaces that contact the flap at said root end and the when the fluid valve is closed;
    the cantilevered flexible flap being mounted in contact with the respective sealing surface of the valve seat at said root end and being freely movable to flex away from the respective sealing surfaces of the valve seat at said free end when fluid flows through the fluid valve and the fluid valve is open; and
    said root end of the cantilevered flexible flap and the respective sealing surface that contacts the cantilevered flexible flap at said root end having a transverse configuration extending in a direction transverse to said longitudinal axis, said transverse configuration resulting in maintaining the flap substantially in contact with said sealing surfaces of the valve seat in the absence of an opening pressure differential across the flap, in any orientation of the valve.

Moldex has submitted an expert declaration from Erik Antonsson.  In his expert declaration, Antonsson opined that based on Hanson's testimony regarding the '974 patent, "Horda is relevant to the issue of whether the subject matter of claim 12 of the '974 patent was patentable and is likely to have been important to a reasonable patent examiner in deciding whether to allow claim 12 of the '974 patent to issue."  Antonsson Decl. ¶ 59.  He further opined that Horda does disclose the last clause in claim 12 - that is a "transverse configuration extending in a direction transverse to said longitudinal axis".  Id. ¶ 62.  In support, he cites to the following language in the Horda specification:

> In the embodiment shown the attached portion 13 of the valve membrane 11 has been given increased thickness to allow attachment in the form of studs 14 to be moulded on, see Figure 3.  Even if the valve membrane is provided with holes through which studs on the attachment portion of the valve seat shall be passed, the valve member may be made thicker at the attachment portion to strengthen the attachment area of the membrane.

Antonsson Decl. ¶ 63 (citing Horda, p. 4, lines 24-32).  Antonsson then goes on to state that this transverse configuration maintains the flap in contact with the seal surface.  Id. ¶ 65.  To support this opinion, Antonsson cites to additional language of the Horda specification, specifically:

> In compression-moulded state the rubber material is resilient and *if the membrane is given a bevelled edge 12 it will seal against the border 3 of the valve*

*seat in closed position . . .*

Id. (citing Horda p. 4, lines 17-23) (emphasis added).  Finally, Moldex asserts that the PTO has similarly described Horda in an office action rejecting a later Japuntich application.  Prange Decl., Ex. 415.

Nothing in the specification or claims of Horda expressly addresses the limitation at issue here: "the transverse configuration at the root end of the flap and sealing surface cause the flap to press against the seal surface."  See Vandenburgh Decl., Ex. 13.  Contrary to Antonsson's opinion, the specification provides, focusing on the above italicized language, that the bevelled edge, not a transverse configuration, causes the flap to seal against the seal surface.  Id. p. 4, lines 17-23.

Furthermore, even though Horda may recite the first four elements of claim 12, it appears that those elements are also disclosed in U.K. Patent Application No. 2, 075, 516 ("Simpson").  Vandenburgh Decl., Ex. 6.  Simpson is prior art that was disclosed during prosecution[5], and it describes a protective face mask, with an exhalation valve that:

---

[5]See Vandenburgh Decl., Ex. 4, '974 patent, p. 1 (citing Foreign Patent Document GB 2 072 516, Simpson patent).

comprises a flexible circular flap member 15 of, for example, plastics material, which is arranged to cover and closed valve openings 16 during inhalation and to flex away from those openings during exhalation.  To allow flexing of the flap member 15 a part of its peripheral portion, a segment of the flap member, is fixed in position, the remaining part of the flap member being left free.  The valve is fitted in an aperture in the mask and is held in place by a retaining ring 17 which engages the edge portion of that opening to provide an effective seal.

Id. 2:37-50.  Similarly, there is no mention, either in the specification or claim language, in Simpson that addresses the limitation in the '974 patent that "the transverse configuration at the root end of the flap and sealing surface cause the flap to press against the seal surface."

As noted above, it is not a material omission to fail to submit cumulative prior art.  Scripps Clinic & Research Foundation v. Genentech, Inc., 927 F.2d 1565, 1582 (Fed. Cir. 1991) (a reference that is simply cumulative to other references does not meet the threshold of materiality that is predicate to a holding of inequitable conduct.)  Because Horda and Simpson are cumulative, and Simpson was disclosed during prosecution, Horda would not be considered material.  Based on this record, the Court finds that Moldex has not met its burden of demonstrating, by clear and convincing evidence, a genuine issue of fact that Horda was material to the '974 patent.

13

## 2.      Materiality - the Japuntich Patents

Horda is listed as a prior art reference in the '868 patent, thus with respect to Moldex's claims of inequitable conduct, the issue is whether Horda is material to the '248 and '463 patents.  Moldex argues that Horda is material to these patents, and that Hanson admitted as much during his deposition when he testified that Horda discloses "virtually all" of the features of the Japuntich patents.  When asked if he cited Horda to the patent office during the prosecution of the Japuntich patents, Hanson stated:

> A: The reference was cited in the Japuntich patent applications.  Albeit, I think it was material, in view of the art that was already of record, to err on the side of caution and have the reference before the examiner.

Vandenburgh Decl., Ex. 19 (Hanson Dep. p. 260).  After this statement was made, discussion was had as to whether Hanson misspoke, and his testimony was read back.  Id. p. 260-261.  Hanson then stated:

> A: Yeah, I think what I said was "albeit cumulative to art that was already of record."

> Q: So you believed it was material, albeit cumulative of art of record – so we get a clear answer.

14

A:  No, I don't think there was any admission that was made as to whether

or not it was or was not material.  It was being cited to the patent office to –

Q: Did you just use the words "material?"  I'll read you back your previous

answer.

You said, "it was material, albeit cumulative."  Isn't that what you said?

A: I don't know.  Did I say that?  If I said that , that's not what I intended to

say.

Q: Let's see what he first said.

A: If it's cumulative, it can't be material.

Id. p. 261-62.[6]

Thus, contrary to Moldex's assertions, Hanson did not "admit" during his

deposition that Horda was material to the Japuntich patents.

Moldex's expert also provided an opinion as to the materiality of Horda

with respect to the '248 and '463 patents.  To illustrate, Antonsson prepared

charts listing the elements of claim 1 of the '463 patent, with corresponding

---

[6]This is consistent with testimony of Hanson earlier in the same deposition in which he stated: "And my review of the document led me to believe that Horda was cumulative in view of references that were already of record, but I asked for a second opinion on the subject from attorneys at Carlson, Caspers."  Id. p. 246.

listings of Hanson deposition testimony in which he concedes an element is disclosed in Horda.  Antonsson Decl. ¶¶ 47 and 52.  Moldex argues that these charts demonstrate how important Horda is to the Japuntich patents.  Antonsson further opines that Horda, together with Simpson and Braun, another prior art reference, disclose all of the claim limitations in claim 1 of the '463 patent.  Id. ¶ 53.  He also offered the opinion that Horda is not cumulative to other references. Id. ¶ 68.

With respect to the charts, the Court notes that the charts only show that five of the ten elements of claim 1 of the '463 patent are present in Horda. See Id. ¶¶ 47 and 52.  In addition, these same five elements appear in the Simpson prior art.  See Vandenburgh Decl., Ex. 6 (showing a single stationary flap, with a stationary portion and a free portion, the free segment of the circumferential edge associated with the free portion of the flap, and secured non-centrally).  See also, Prange Decl., Ex. 415 at 3M0096164-65 (PTO description of the Simpson reference in Office Action dated April 11, 2006).  As Horda and Simpson are cumulative, Horda would not be considered material.

Moldex also argues the materiality of Horda is demonstrated by the fact that the examiner rejected another Japuntich application based on Horda.  Id. at

16

3M0096165.  No evidence was presented to the Court, however, as to which

claims were rejected in that application.  See Id.  The relevance of the comments

made by the examiner in the rejection can only be demonstrated by referring to

the claims asserted.  This is especially true given the fact that the '868 patent

issued in October 2006, despite the Horda disclosure in February 2005.

Vandenburgh Decl., Ex. 3 ('868 patent).  Nonetheless, the PTO's discussion of

Horda does not clearly demonstrate Horda's materiality.

> To the extent, *if any*, that the flap of Simpson et al. may not be pressed
> towards the seal surface in an abutting relationship therewith when the
> fluid is not passing through the orifice resort is had to Soderberg [Horda]
> in a face mask having an exhalation valve that is pressed towards the valve
> seal surface in an abutting relationship therewith, when fluid is not passing
> through the orifice for the purpose of ensuring and maintaining a seal
> between the exhalation valve and the valve seat.

Id.  Use of the words "if any" indicates the PTO's determination that Simpson

arguably does contain this limitation, lending support to the argument that

Horda is cumulative to Simpson.  Accordingly, the PTO's discussion of Simpson

and Horda does not establish, by clear and convincing evidence, that Horda is

material.

Finally, another Moldex expert, James T. Carmichael, also opined that

Horda and Simpson are not cumulative.  The Court notes that Carmichael's

opinion is based solely on the affidavit of Antonsson.  Carmichael Decl. ¶ 53.  As

discussed above, however, Antonsson's opinion is contrary to the claim language

and specifications of both Horda and Simpson, and other evidence in the record.

Accordingly, Carmichael's opinion does not constitute clear and convincing

evidence as to the materiality of Horda.

Based on the evidence submitted, the Court finds that Moldex has failed in

its burden of producing sufficient evidence demonstrating, by clear and

convincing evidence, a genuine issue of material fact that Horda is a material

reference with respect to the '248 and '463 patents.

### 3.  Intent

Even if the Court were to find that a genuine issue of material fact exists as

to whether Horda was material to either the Bowers or the Japuntich patents,

Moldex can prevail on its inequitable conduct claim only if it demonstrates, by

clear and convincing evidence, that Hanson intentionally withheld the Horda

reference, with the intent to deceive the patent office.  See Allen Organ Co. v.

Kimball Int'l, Inc., 839 F.2d 1556, 1567 (Fed. Cir.1988) (Materiality does not

presume intent, which is a separate and essential component of inequitable

conduct).

As noted above, Horda was first revealed in a European Search Report issued during the prosecution of two foreign applications related to the '974 patent.  The first report was issued on January 16, 1998, and at that time, the original Bowers patent had already issued.  Vandenburgh Decl., Ex. 7 and 14.  In addition, 3M purchased Racal on January 29, 1998, two weeks after the report issued and after the patent issued.  Id., Ex. 8.  Under these circumstances, there would have been little incentive for Hanson, or anyone at 3M, to read the Horda reference.

The same is true with respect to the second European Search Report that was issued in December 2002. Id., Ex. 15.  At that time, the Bowers' reissue application had already been approved, although not officially issued.  Id., Ex. 17. Under these circumstances, Hanson again would not have had much incentive to read Horda.  In any event, Horda was disclosed as technological background in both Reports, and would thus not be considered highly relevant prior art.  See Tivo Inc v. Echostar Commc'ns. Corp.,, No.2:04-CV-1-DF, 2006 U.S. Dist. LEXIS 64292 at *10 (E.D. Tex. Aug. 17, 2006) (noting that it was not uncommon for patent attorneys not to read "A" references).  In addition, Hanson testified that he was unaware of the alleged materiality of Horda during that period.  Id., Ex. 12

19

(Hanson Dep. p. 242-243).

Moldex argues that notice should nonetheless be imputed to Hanson as early as 1998, because he would have reviewed the European Search Report as part of due diligence when 3M purchased Racal in 1998.  Moldex also asks that an adverse inference be drawn from the fact that Hanson destroyed the notes he took concerning due diligence.  In his deposition, Hanson testified that he took notes during the due diligence related to 3M's purchase of Racal, but that he no longer has them.  Prange Decl., Ex. 5 (Hanson Dep. p. 25).

First, it is not enough that Hanson had notice of Horda.  There must be clear and convincing evidence that Hanson knew of Horda, knew of Horda's materiality and an intent to deceive the patent office by withholding such known reference.  FMC Corp. v. Manitowoc Co., Inc., 835 F.2d 1411, 1415 (Fed. Cir. 1987).  Based on the fact that Horda was designated as an "A" reference, Hanson's testimony that he was not aware of Horda until February 2005, and the timing of the Reports and the issuance of the Bowers patent, the record does not establish a genuine issue as to the requisite intent.  Second, absent additional evidence, the fact that Hanson "no longer has" notes he took during due diligence does not support an inference of intentional destruction of relevant evidence.

20

The same is true with respect to whether Hanson intended to deceive the

patent office by withholding Horda during the prosecution of the Japuntich

patents.  Because the Bowers and Japuntich patents are not related, it is certainly

plausible that during the prosecution of the Japuntich patents, Hanson would not

have thought it necessary to consult the European Search Reports issued with

respect to foreign applications of an unrelated patent.

The '243 patent issued in January 2005, and the '463 issued in February

2005.  Vandenburgh Decl., Ex. 1 and 2.  Hanson testified that Horda came to his

attention with respect to the Japuntich patents in February 2005, when he

received a letter dated February 1, 2005 from Robert Kahn, counsel representing a

separate company responding to claims of infringement of the same patents at

issue here.  Id. Ex. 18; Ex. 19 (Hanson Dep. p. 245-246).  After receiving the letter,

Hanson asked for advice from outside counsel as to whether Horda should be

disclosed with respect to the then pending '463 patent application, despite his

conclusion that Horda was cumulative.  Hanson and outside counsel determined

that Horda should be disclosed to the patent office in order to err on the side of

caution.  Id. p. 246.

On or about February 11, 2005, 3M filed a Petition for Withdrawal from

21

Issue with respect to the '463 patent application in order to allow the examiner to

consider an Information Disclosure Statement, which included the Horda

reference.  Vandenburgh Decl., Ex. 20.  The '463 patent issued before the Petition

to Withdraw could be acted upon by the examiner.  See Id. (Petition posted

received by patent office on February 16, 2005) and Ex. 2 ('463 Patent issued on

February 15, 2005).

Moldex argues that the Bowers and Japuntich patents are related because

both involve valves with curved seats and flexible flaps and Hanson supervised

the prosecution of both.  Thus, at a minimum, Hanson knew or should have

known of the Horda reference as early as 1998.  In addition, there is evidence that

Hanson was put on notice of the Horda reference in October 2004, through a

letter forwarded to him by David Duguid, the addressee of said letter.  Moldex

Exs. 620 and 621.  In this letter, a company marketing a FastFlow Valve

responded to 3M's assertions of infringement by arguing that the Horda

publication would invalidate 3M's Australian patent covering the valve at issue.

Moldex Ex. 621, p. 3.  Thus, Hanson's  failure to disclose Horda prior to 2005

creates a genuine issue on the intent question.  The Court disagrees.

References disclosed in connection with the prosecution of the foreign

counterpart to the Bowers patent have a tenuous connection to the prosecution of

the Japuntich patents, and evidence of such a tenuous connection are not

sufficient to prove an intentional deception for purposes of proving an

inequitable conduct claim.  See CFMT, Inc. v. Yieldup Int'l Corp., 349 F.3d 1333,

1342 (Fed. Cir. 2003) (evidence of gross negligence not sufficient to establish

intent); Dayco Prods, 329 F.3d at 1367 (intent to deceive cannot be inferred from

the decision to withhold a reference where the reasons given for withholding are

plausible.)  This is especially true for references that have been designated as

providing only technical background.  See Tivo Inc., No.2:04-CV-1-DF, 2006 U.S.

Dist. LEXIS 64292 at *10 (finding most patent attorney's do not read technical

references).  Based on the evidence in the record, it is thus plausible that Hanson

did not consider Horda to be material given its "A" designation on a European

Search Report, and that the results of such Report would not need to be

considered in the prosecution of an unrelated patent.

With respect to the October 2004 letter forwarded to Hanson, Hanson

testified at his deposition that he recalled receiving the letter, that it concerned an

Australian patent, but that he could not recall if it was the corresponding patent

to the Bowers or Japuntich patents.[7] Vandenburgh Decl., Ex. 19 (Hanson Dep. p.

242).   He also testified that he recalled reading the first two pages and coming to

the conclusion that the arguments asserted were weak. Id.  He then set the letter

aside, and did not read it further until February 2005, after he received the letter

from Kahn.  Id., p. 242-43.

Although no evidence has been submitted discrediting this testimony,

assuming Hanson had read entire letter, specifically that portion addressing

Horda, the record does not contain any clear and convincing evidence that

Hanson was aware of the materiality of Horda, and that he intentionally

withheld Horda in order to deceive the PTO.  See FMC Corp., 835 F.2d at 1415.

The Court thus finds, after reviewing the entire record, that Moldex has

not demonstrated that genuine issues of material fact exist as to whether, by clear

and convincing evidence, Hanson intended to deceive the patent office by

withholding Horda during the prosecution of the Japuntich patents.  Summary

judgment with respect to allegations concerning Horda is appropriate.

---

[7]On page two of the letter, there is argument concerning the "transverse curvature" limitation in the 3M patent.  Only the Bowers patent includes such a limitation.  Therefore, it is likely that the Australian patent corresponded to the Bowers patent.

### B.  Allegations that Hanson Misrepresented Prior Art and Other Acts of Misconduct.

The remainder of the inequitable conduct claims are largely based on alleged false or misleading statements made by Hanson regarding the prior art during the prosecution of the Japuntich patents.  In addressing these allegations, the Court must keep in mind that advocating a particular interpretation of a prior art reference, to which the examiner is free to accept or reject, is permissible as long as the interpretation did not involve factual assertions that could give rise to a misrepresentation claim.  Life Techs., 224 F.3d at 1326 (reversing district court judgment of inequitable conduct); CFMT, Inc., 349 F.3d at 1341-42.

An example of inequitable conduct is addressed in the decision of Monsanto Co., 514 F.3d 1229.  In Monsanto, the court found that the patent holder, Bayer, had taken a certain position before the PTO, and had failed to disclose notes it had obtained from a prior inventor and Bayer employee that directly contradicted such position.  The court further found that Bayer "had made a deliberate decision to withhold the known highly material reference with the specific intent to deceive or mislead the PTO examiner."  Id. at 1237.  It is 3M's position that Moldex has not identified any statements or omissions, like

that found in <u>Monsanto</u>, to support an inequitable conduct claim.

3M asserts that the Japuntich patents were prosecuted for over ten years, involving only two patent examiners. The length of the prosecution undermines Moldex's theory that Hanson misled the PTO by advocating certain interpretations of the prior art. In addition, the prior art that Hanson is alleged to have made misrepresentations about was the subject of extensive debate - in particular U.S. Patent Nos. 2,320,770 ("Cover '770") and 4,934,362 ("Braun"). In fact, examiners Asher and Lewis rejected claims in the Japuntich applications in view of Cover '770 and Braun twelve times. In response to each rejection, Hanson debated the relevancy of those references, and such advocacy cannot form the basis of an inequitable conduct claim, absent factual assertions that are made with the intention to deceive.

Moldex argues that genuine issues of material fact exist with respect to its claims of misrepresentation concerning disclosed prior art. For example, Moldex asserts that Hanson repeatedly misrepresented the structure disclosed in the Cover prior art[8] when he described Cover as having "a centrally mounted,

---

[8]3M asserts that Moldex is asserting that Hanson made misrepresentations concerning U.S. Patent 2, 105,183 ("Cover '183"). However, Hanson testified that he was not aware of the Cover '183 reference until July 2005. Vandenburgh Decl., Ex. 12, Hanson Dep. p. 244-45. Any

hemispherically formed flap [that] opens only on one side, leaving the other

closed by the 'rocking' of the flap across the center mount" when he knew or

should have known that statement to be false as both sides of the flap could

open.  See Antonsson Decl. ¶ 27.  Hanson further stated that Cover '770 would

cause a pressure drop when air is passed at a velocity of 0.8 m/s, but later

testified that he did not do any testing to confirm this statement.  Prange Decl.,

Ex. 7 (Hanson Dep. p. 175).

　　　Moldex also asserts that Hanson made a number of misrepresentations

concerning the Braun prior art.  For example, Hanson is alleged to have

misrepresented Braun to the European and U.S. patent offices by stating that

Braun did not teach or suggest placing an exhalation valve on the filtering face

mask where the exhalation valve had a flexible flap secured to the valve outside

the region encompassed by the orifice, when he knew or should have known

upon, even a causal reading of Braun, that one embodiment had such a

configuration.  Antonsson Decl., ¶ 36.  Hanson also argued that Braun did not

---

statements made by Hanson concerning Cover were related to U.S. Patent 2,320,770 ("Cover
'770").  Moldex has not submitted any evidence to the contrary.  For example, Moldex cites to
Ex. 393 at 3M0024899 to demonstrate that Hanson made false statements about Cover, but this
exhibit refers only to Cover '770.  The same is true with respect to Exhibits 384, 385, and 401.
Therefore, in addressing these claims, the Court will only focus on Cover '770.

teach a person of ordinary skill in the art how to make a valve seat with a concave curvature that corresponds to certain deformation curves, when he knew or should have known that Braun taught a parabolic seat that did, in fact, correspond to a specific curvature.  Id. ¶ 37-38.

Moldex further complains that Hanson misrepresented the advantages of the Japuntich invention over the prior art.  For example, Hanson stated that the advantages of the invention were accomplished by securing the flexible flap to a region outside the orifice, when he knew or should have known that Braun and Cover showed the same construction.  Prange Decl., Ex. 393 at 3M0024899.

The Court has reviewed each alleged misrepresentation[9], and has reviewed the context in which each misrepresentation was allegedly made and finds that all of the statements by Hanson highlighted in this case were merely arguments or interpretations of the prior art of which the patent examiner was free to accept or reject.  None included factual assertions that would give rise to an inequitable conduct claim.

_____

[9]This review includes allegations that Hanson misrepresented the supposed advantages of Japuntich, misrepresentations as to what had been commercialized in the prior art, misrepresentations concerning the motivation to combine prior art, characterizations that prior art was non-analogous and misrepresentations as to the Ventex valve.

For example, Hanson's comments that Cover '770 shows a valve having mounting hardware located inside the orifice was a reasonable argument and consistent with his position that  Cover '770 discloses a single orifice that is divided into two openings.  Further, the allegations that Hanson had not done any testing to support his statement that Cover '770 would cause a pressure drop when air is passed at a velocity of 0.8 m/s, does not support an inequitable conduct claim as Hanson testified that he had test data for a similar valve, the Braun valve, and that it was reasonable to expect that one would get the same performance from similar valves.  Prange Decl, Ex. 7, Hanson Dep. p. 175-76.

More importantly, Moldex has not demonstrated that any of the alleged misrepresentations were material; that such misrepresentations likely effected the outcome of the patent prosecution.   See McGinley v. Franklin Sports, Inc., 92 F. Supp.2d 1216, 1222 (D. Kan. 2000) (mischaracterization of prior art was not inequitable conduct as there was evidence that the patent examiner noted the mischaracterization and disregarded it).

Given the lengthy prosecution history of the Japuntich patents, the record is replete with evidence that the patent examiners had the opportunity to view and study the prior art cited, and to address Hanson's arguments in view of the

prior art.  3M is thus entitled to summary judgment as to these claims as well.

**IT IS HEREBY ORDERED** the Plaintiffs' Motion for Summary Judgment

of No Inequitable Conduct [Doc. No. 428] is GRANTED in its entirety.

Date:   August 08, 2008

s / Michael J. Davis
Michael J. Davis
Chief Judge
United States District Court

Civil No. 03-5292